GREAT NORTHERN EXPLORATION COMPANY
v. BEN A. MIZEN.

MAHNOMEN MINING COMPANY, GARNISHEE.[1]

July 15, 1921.

Nos. 22,013-22,061.

**Assignment of mining option and lease — constructive trust.**

The defendant and two others entered into an agreement, having as its object the development of a mining property on the Cuyuna range, an option on which was taken in the name of the defendant. The plaintiff corporation was organized to forward the project. The defendant's two associates were the officers of the company. Stock was issued to the defendant in consideration of the transfer of the option. A certain amount was equally divided among the three promoters, and another amount was donated to the corporation to be sold for the purpose of raising working capital for development. The defendant was a practical mining engineer, was in charge of the work of development, and was active in the affairs of the company. Shortly before the option expired, the defendant entered into an agreement with the plaintiff, whereby he might have the option at an agreed price and make such use of it, or of a lease taken under it, as he could. He took a lease and sold it for the price which he gave for the option and in addition a specified royalty on the output. It is *held*, under the facts stated in the opinion, that there was a relation of confidence and trust between the defendant and the plaintiff and its stockholders, and that he could not retain for himself the advance royalty received.

Action in the district court for St. Louis county to recover $230,000 royalty on two million tons of ore and for an accounting. Defendant's demurrer to the complaint was overruled. The case was tried before Dancer, J., who made findings and ordered judgment in favor of plaintiff for $2,623.43. From the order denying defendant's motion for amended and additional findings and conclusions or for judgment in his favor or for a new trial, and from the judgment entered pursuant to the

[1]Reported in 184 N. W. 20

order for judgment, defendant appealed. Order and judgment affirmed.

*Hugh J. McClearn,* for appellant.

*I. K. Lewis,* for respondent.

DIBELL, J.

This action as it finally results is one to compel the defendant Ben A. Mizen to transfer to the plaintiff the royalty of 3½ cents per ton granted to him in the assignment of a mining lease to Clement K. Quinn for $15,000, and by the latter assigned to the Mahnomen Mining Company. The lease was executed to Mizen by the fee owners in pursuance of an option which, though in his name, was the property of the plaintiff mining company, and was by the company assigned and released to him that it might be assigned.

The defendant appeals from an order denying his motion for a new trial and from the judgment which in effect gives the 3½ cent royalty to the plaintiff. The question is whether the defendant can retain the royalty for himself or holds it under a constructive trust for the plaintiff.

Mitzen was a mining engineer and apparently a capable one. L. J. Pitts was found by the court to be a competent office man experienced in mining work, and A. J. Peterson was found to be an experienced salesman of corporation stocks. Mizen had operated successfully on the Cuyuna range, in Crow Wing county. He had in prospect an option from the fee owners for a lease of lands on that range. Late in 1914 Mizen and Pitts and Peterson concluded to combine their efforts, acquire the mining option, and develop the lands covered by it to a point where the option or a lease taken under it could be sold. They were enthusiastic and saw visions of great things to come through the development of this and other properties. To carry out their project the plaintiff corporation was organized by Pitts and Peterson in January, 1915.

The option to Mizen was dated February 1, 1915. On February 3, 1915, he made a formal offer to transfer it to the plaintiff company in exchange for 75,000 shares of its capital stock of the par value of one dollar each. This offer was formally accepted. Twenty thousand shares were then transferred by Mizen to Pitts and a like numper to Peterson. Fifteen thousand shares were donated to the plaintiff to be used in raising money for development. Those who bought chanced their money

on the proposition that the prospect was worth developing upon an assumed present worth of $60,000. Enough of actual money was put in for organization expenses. There was no cash or liquid capital. That was to come from the sale of stock.

Pitts and Peterson maintained the office of the company in Duluth. An attractive prospectus was issued. The public was not greedy for the stock and sales had to be pushed. It was peddled about and sold, often in small quantities, and on instalment payments, and commissions were paid to Pitts and Peterson and subagents for selling. Something like 12,000 shares of the donated stock were sold, but not nearly so much as $12,000 was received by the company. The exact condition of the stock account is not clear nor important just now. Thus the corporation was financed.

Mizen had the contract for the drilling at an agreed price. The total cost was $10,050. He was paid $2,422, leaving due $7,628. In October, 1915, say about the twentieth, the company had no money, or, to be precise, it had $5.21 in bank. What had been realized from the sale of the stock, except the $2,422, had been used in maintaining an office in Duluth and paying the salaries of Pitts and Peterson, and incidental expenses. Mizen had financed the drilling, except for the $2,422 paid him. The option expired on the first of November following. The late explorations were discouraging. Pitts and Peterson were losing hope and Mizen was anxious about his drill bill.

Clement K. Quinn was interested in the Mahnomen mine which adjoined. The property under option could be mined advantageously in connection with the Mahnomen. There was doubt whether it could be otherwise used profitably. Quinn had been mentioned as a possible purchaser. Mizen told Pitts and Peterson that Quinn had said that he would not give more than $15,000 and this was so. He told them in effect that he could get no more and that it was all the property was worth. Quinn, knowing something of the condition of the company, would not deal with it. If he took the property he insisted that the option or lease come from Mizen.

In an amended finding the court, referring to the conditions then existing, found: "Under these circumstances it was agreed between said Peterson and said Pitts and said defendant that each of them

should surrender for cancelation fifteen thousand (15,000) shares each of the twenty thousand (20,000) they received for the assignment to the plaintiff corporation of the option of the defendant. That the plaintiff would execute to the defendant a release of all its right, title, interest and estate in and to the option which he had from the fee owners for a lease to the lands hereinbefore described, together with all the profits that defendant might make out of a lease taken thereunder, said agreement being contingent on said Peterson and said Pitts, as well as the defendant, each surrendering fifteen thousand (15,000) shares of his stock in the plaintiff company, and agreeing that neither said Pitts, said Peterson nor said Mizen should receive any dividend on the five thousand (5,000) shares of stock in the plaintiff company, which each of them would then hold; and further agreeing that defendant should pay plaintiff fifteen thousand dollars ($15,000) for said option; seven thousand dollars ($7,000) of said amount to be applied in payment of the seven thousand six hundred twenty-eight dollars ($7,628) due him from plaintiff on his contract for drilling said lands, the remaining eight thousand ($8,000) to be paid by the plaintiff company to all of its stockholders, who had paid cash for their stock and the balance remaining after the stockholders had been paid dollar for dollar, to be used in defraying any expenses incident to the conduct of the office of the plaintiff company since opening thereof in March, 1915."

An agreement and an assignment or release in writing dated October 28, 1915, and acknowledged October 29, 1915, were deposited in escrow to be delivered to Mizen upon his performance, within 21 days, of the conditions. Mizen was not required to perform or take the property. The instruments were, as observed by the trial court, somewhat in the nature of an option. However, as noted later, he did perform. The agreement recited that the company had given the defendant 75,000 shares of stock in consideration of the option and that he held 20,000 shares. It recited that he had carried on explorations at a cost of $10,050, for which he had been paid $2,422. Paragraphs 1, 2 and 3 were as follows:

"1. The party of the second part [Mizen] does hereby agree, upon the delivery of this agreement in the manner hereinafter provided, to pay to the party of the first part [plaintiff] the sum of eight thousand

($8,000.00); and to deliver or assign to it fifteen thousand shares of the capital stock of the party of the first part now appearing upon the company's records in the name of one Fallo, and the party of the second part does further agree to fully release and discharge the party of the first part from any or all claims of any kind whatsoever, which he may have or assert against it by reason of any of the transactions heretofore had between the parties hereto.

"2. The party of the first part, in consideration thereof, does hereby grant, bargain, sell, convey and release to the party of the second part any and all rights which it may have or might assert in or to said option for a mining lease, and in and to any mining lease which may be executed pursuant to said option, and in and to the leasehold estate which may thereby be created, and in and to the lands described in said option, and does assign, set over and release to the party of the second part any and all right to the proceeds or the consideration which he may in any manner receive out of said option or said lease, and does further release him from any or all claims which it might have or assert against him on account of any transactions heretofore had between the parties hereto.

"3. It is further agreed by and between the parties hereto that each of the parties hereto shall execute to the other a simple release of all rights or claims which it, or he, might assert against the other."

The assignment or release was executed at the same time and deposited in escrow in accordance with the terms of the agreement. The portion now quoted is sufficient for present purposes:

"That the party of the first part [Great Northern Exploration Company], in consideration of the sum of one dollar ($1.00) and other good and valuable considerations, to it in hand paid by the party of the second part, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, convey and release to the party of the second part any and all rights which it may have, or might assert, in or to that certain option for a mining lease, dated on or about February 1, 1915 [naming fee owners and describing the property], and also all the right, title and interest, which it might have or assert in any mining lease which may be issued pursuant to said option, and in and to the leasehold estate which thereby may be created, and in and to the lands described in said option, and in and to the proceeds or other considera-

tion or profits which the said party of the second part may, in any man-
ner, receive out of said option or said lease; and the party of the first
part, for said consideration, does hereby further forever release and dis-
charge the party of the second part from any or all claims which it
might have or assert against the party of the second part on account of
any transactions heretofore had between the parties hereto."

Mizen performed the conditions of the escrow agreement and received
the two instruments about November 6, 1915, or soon afterward.

On October 29, 1915, he notified the fee owners of his election to take
a lease. Under date of November 6, 1915, he assigned the lease to Clem-
ent K. Quinn. Before this he had obtained a reduction of the minimum
output after the third year from 75,000 tons to 50,000 tons and also
cleared some minor defect in the title. The assignment of the lease was
acknowledged December 9, 1915. By an instrument dated and acknowl-
edged on November 11, 1915, Quinn assigned the lease to the Mahnomen
Mining Company. This instrument recited that the lease from Mizen
to Quinn was delivered on November 10.

In performing the terms of the escrow agreement, Mizen, so the court
finds, used the money obtained from Quinn. Something of this kind
was contemplated when the agreement was made. The company receiv-
ed the equivalent of $8,000, and Mizen took $7,000 for his claim of
$7,628. This was in substantial accordance with the agreement.

The court finds that about October 20, 1915, Mizen became convinced
that he could sell to Quinn for at least $15,000; that he told Pitts and
Peterson that he thought he would dispose of it for such sum; that he
told them he could get no more for it; that he told them he had tried to
get an increase over the royalty fixed; that Pitts and Peterson believed
these statements and relied upon them, and that so relying executed the
two agreements.

It does not seem that Mizen had abandoned hope of getting an addi-
tional royalty when the agreements recited were made and put in escrow.
On the day of their execution he suggested to Quinn an increased royalty
and received encouragement. He had before been negotiating with the
fee owners for a decrease of the minimum output and finally obtained
the reduction stated. This was advantageous to the purchaser of the
lease, made the lease more salable, but was less favorable from an in-

come standpoint to the seller. It was something which Quinn wanted. There was also a defect in the title which Mizen cured.

The question now comes whether Mizen could take to himself the 3½ cents additional royalty, or whether it should be applied to the use of the plaintiff corporation. That a stranger making the agreements which Mizen made would be entitled to the additional royalty is clear. The trial court was of the opinion that Mizen was not in a position where he was dealing at arm's length with the company, and it was of the opinion that Mizen when he learned, as he did before the closing of the deal with Quinn, that he could get a royalty of 3½ cents, was bound to disclose and could not take it for himself. This latter view was based on the doctrine stated in 13 C. J. 389, § 291, as follows: "If a person makes a representation believing it to be true but afterward discovers it to be false, he must not allow the party to go on and act on the faith of the representation; if he does so he is guilty of fraud."

A number of cases are cited in support of the doctrine. They, in general, are cases of actual fraud, or cases where in the course of negotiations, and before the fixing of rights by a completed contract, a material change comes or a fact is discovered which makes a previous representation untrue. Then the maker of the representation must disclose. The trial court seems to have applied this principle, upon the supposition that when Mizen found that he could get a royalty from Quinn he had not changed his position. In a later memorandum the court indicates that it was mistaken in this respect, for Mizen at the time had taken the lease and assumed the obligations attaching to it. We gather from the findings and amended findings and the memoranda that the court was not of the view that there was actual fraud prior to October 29 avoiding the agreements then made. And we do not understand that the court would have held that a stranger could not have taken to himself the benefits of such an advance royalty as was secured.

In commenting upon the relation of the parties the trial court says in its first memorandum: "Defendant's alliance with Pitts and Peterson was an unfortunate one for him. All the benefit he derived from it was the use for a time of $2,422.00 paid to him on account of the drilling, while it costs him more than two-thirds of the ultimate profits of the transaction. In entering into the arrangement he undoubtedly

relied upon what proved to be quite extravagant ideas of Pitts and Peterson as to the amount of stock they could sell to the public. When it developed that they could not raise money as fast as it was needed for the exploration, defendant undertook for a time to protect himself to some extent by retaining the option in his own name. And later on he attempted to secure the general stockholders from actual loss by an agreement with Pitts and Peterson that they should pay back to these stockholders, out of the $8,000.00 turned into the company, whatever cash they had paid for their stock, which agreement was carried out in part only by Pitts and Peterson. But defendant could not protect himself in that manner. While the corporation was organized simply as an instrument to further the interests of the three individuals, yet stock thereof was sold to the general public at the investigation and with the approval of all; and the purchasers of this stock became entitled to share in any profits, regardless of the circumstances under which defendant associated himself with Pitts and Peterson. These stockholders became entitled to demand the utmost good faith and fidelity to their interests from their officers, and through them, from defendant."

The venture initiated in the fall of 1915 by Mizen, Pitts and Peterson, was a joint one. Each was entitled to repose confidence in the others and to insist upon the utmost good faith. Each was to work for all. All three contemplated that money for development would come from stockholders investing in the hope of profit. The three received $60,000 in stock which was taken as representing the value of the option. They risked nothing, or next to nothing, just the cost of organization. Pitts and Peterson got salaries and commissions; Mizen presumably profited on the drilling. The men who purchased the $15,000 of donation stock, if that much had been sold, paid for the development and risked their money with no hope of getting all of it back, unless the property proved to be worth $75,000, and for a value in excess of that they shared in the proportion of one-fifth to four-fifths. Pitts and Peterson and Mizen could not be unfair to them. The relation was confidential. Each owed to his associates and the stockholders open good faith and active diligence in their interests. Neither of the three could speculate upon the sale of the property for the development

of which the stockholders were paying, and take a profit to himself. The principle which forbids, as applied to this case, is troublesome and the result recorded is not free of doubt, but we are constrained to hold that Mizen, who was the active man in the actual development and disposition of the property, and active in the affairs of the corporation, was so situated that he could not make a profit by the contract with Quinn, though he was free of actual fraud or wrongdoing.

The position of Mizen, from the viewpoint of his counsel, is forcefully presented, and merits and has received thorough consideration. It is argued that in October, 1915, when negotiations commenced, the company was without funds, and that it owed Mizen over $7,000, and owed others, and all this is true; that the mine was not showing well; that things looked gloomy; that the three promoters were discouraged; that Mizen thought he could sell for $15,000; that, unless something was done by November 1, all was gone; that Mizen was anxious for his $7,000; that it was desired to protect the stockholders who had chanced their money on the development; that the arrangement made would do this, and would leave them their stock, while the original $60,000 stock would be reduced to $15,000; that Mizen, by taking the lease, assumed liabilities which would not have rested upon him if the contract had not been carried out; that he took the risk of not being able to sell it; that he assumed liabilities when he assigned to Quinn with a warranty; that he obtained a reduction of the minimum output, which he did not owe the duty of doing for the plaintiff company, and likewise cured defects in the title; that what Quinn got by the assignment was not a lease such as was called for by the option, but a lease with a reduced minimum output, and with the warranty of Mizen; that the plaintiff, after full consideration and upon authority of its board of directors, gave him just what he now claims; that, but for the contract with him, the company and its stockholders might have gotten nothing; that he was taking a chance of losing; that he might have sold for $10,000, if he could get no more, in which event he would have been required to pay $8,000 to the plaintiff just as when he made a better sale; that the contract was made openly and was fair; that the agreement of the company was to convey to him "all rights which it may have or might assert" in the option, and "all right to the proceeds

of the consideration which he may in any manner receive out of said option or said lease," and to "release him from any or all claims which it might have or assert against him on account of any transactions heretofore had;" that the release executed by the company conveyed and released to him all the right, title and interest which it might have or assert "in and to the proceeds or other consideration or profits which the said party of the second part [Mizen] may, in any manner, receive out of said option or said lease;" that it was contemplated that he should have the chance of a profit and that he took a chance of loss; that his position was not such that he could not deal at arm's-length with the company, and that, in any view of it, the arrangement under all the circumstances was fair to the corporation and its stockholders and a prudent one to make.

It is true of course that even a director or officer may make a fair contract with his corporation. Minnesota L. & T. Co. v. Peteler Car Co. 132 Minn. 277, 156 N. W. 255, and cases cited. We are, however, of the opinion that the relation of Mizen to the stockholders, those who were furnishing the development money, as well as those who were promoters with him, was such that he could not make a private profit out of turning the property, though in disposing of it he assumed liabilities which he was not under obligation to the company to incur, and though he was not guilty of intentional wrongdoing.

The defendant complains that Pitts and Peterson did not dispose of the $8,000 for the benefit of the stockholders, as the agreement was, but appropriated it largely to themselves. The finding is that the "agreement was carried out in part only by Pitts and Peterson." They are not parties and nothing can be done about it here. If they did wrong in the disposition of the $8,000 relief can be had in some form, but not in this proceeding as it now stands.

Order and judgment affirmed.

HOLT, J. (dissenting).

The situation and the claims of the parties are clearly and concisely stated by Justice Dibell, but the result reached does not appeal to me as right nor compelled by the doctrine invoked. The findings and record accord to defendant the utmost good faith in all his dealings with

plaintiff and its officers, his associates Peterson and Pitts, save in this, that, between the time he made the contract to purchase the option of plaintiff and the time he took it out of escrow by payment, he ascertained that he could obtain a royalty from Quinn in addition to the $15,000 which, when the contract was executed, he had told Peterson and Pitts was the highest amount Quinn would pay.

From the beginning defendant refused to be an officer of plaintiff, but, concede that he was in the same condition as if an officer, he could, nevertheless, properly enter into a fair contract with the corporation. Minnesota L. & T. Co. v. Peteler Car Co. 132 Minn. 277, 156 N. W. 255.    It seems to me the contract he did make was fair, and, under all the circumstances, fairly made.   When it was entered into there was hope and belief, but no certainty, that defendant would be able to dispose of the option thereby transferred to Quinn so that he could pay $8,000 to the corporation and get sufficient to pay the whole or most of the claim that he held against it.   Plaintiff was then at that stage where it was evident to all that no profit could be realized for the stockholders.  It was a question of saving something for them and paying the liabilities.   Defendant stood a chance of losing a large sum which he alone had risked in exploring for ore under the option, and, unless he was willing to make the effort to realize something therefrom, all concerned would certainly sustain a loss.   In order to be able to realize the amount defendant was to pay under the contract, it was, no doubt, clearly understood that he would have to sell and dispose of the option.   The contract so indicates.   In order to dispose of the option to Quinn he had to secure a modification of its terms, and incur certain personal obligations.   The option he transferred to Quinn was in a more valuable state than when transferred to him.   It was, no doubt, well understood that for the efforts he was to make he stood the chance of loss or gain.   The contract was deliberately made by plaintiff and its officers.   It was completely executed and irrevocable as to them.   It could not be taken out of escrow or recalled by them because of anything thereafter developing.   It contains no provision looking towards its cancelation by plaintiff, if defendant could dispose of the option at a higher price than the one he had represented that Quinn might be induced to give.

. Suppose defendant had gone to plaintiff's officers and informed them that he had succeeded in obtaining twice the price and twice the royalty that he did obtain, would plaintiff have been in a position to recall the escrow? I think not, under the finding that defendant had exercised the utmost good faith and had disclosed all that was known to him, as to the probability of his being able to dispose of the option and for what price, when the contract was signed and placed in escrow.

It is clear to me that the parties dealt at arm's-length, not only when the contract was negotiated, but also intended that when it was put in escrow it terminated all confidential relations that ever existed, so that as to what was developed thereafter and as to any knowledge or advantage thereafter gained, no obligation rested on defendant to disclose it. Neither the contract nor any tacit understanding required defendant to sell the option to Quinn or to any one. Suppose he had taken it over himself and successfully mined so as to make many times the profit now made, would that have given the plaintiff a cause of action? It would seem not. Again, suppose he had not succeeded to dispose of the option to Quinn, but had sold it to some one else for a better price and better royalty than he did obtain, could this action have been maintained? The answer must be the same, for even if he had informed plaintiff and Peterson and Pitts that he had made such a sale, before he took the contract out of escrow, I see no way in which he could have been prevented from holding onto a bargain fair and just when made. On the findings of fact as they stand I think defendant is entitled to judgment.